961 F.2d 1576
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The CAIN PARTNERSHIP, LTD., Plaintiff-Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant-Appellee.
 No. 91-5524.
 United States Court of Appeals, Sixth Circuit.
 May 11, 1992.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The Cain Partnership, Ltd. ("Partnership"), appeals the district court's dismissal of its suit for acceleration of rent under a sublease agreement. The district court below dismissed the case on its own motion without resolving several important factual disputes between the parties. Because these disputes are crucial to determining whether the Partnership's action has merit, we remand this case to the district court.
 
 
 2
 * Because of the extensive differences between the parties as to the facts, the following outline of the case must not be seen as representing this court's findings. Instead, it merely presents the dispute as the parties described it. On August 27, 1973, the Partnership was formed as part of Lillie Mae Cain's estate plan. Mrs. Cain's daughters were the original limited partners; Project Development Corporation, controlled by Oliver A. Smith, Jr., was the general partner. The Partnership's only asset was a Master Lease, through which the Partnership leased all of Ms. Cain's real estate holdings from a trust that was formed for Ms. Cain's secondary and tertiary beneficiaries ("Trust"). This Master Lease was to run for ninety-nine years. The Partnership owns a leasehold interest in property at 7723 Kingston Pike, in Knoxville, Tennessee, which it subleased to the Federal Deposit Insurance Company. The sublease became effective September 1, 1985 and was to end sixty years later.
 
 
 3
 The sublease was negotiated over several months, during which time both the FDIC and the Partnership were represented by counsel. The sublease was reviewed for the FDIC by the Credit Review Committee in Knoxville, by the FDIC regional staff in Atlanta, and by the FDIC staff in Washington, D.C. This review process took approximately four months. Section 10.02(a) of the sublease is a rent acceleration clause; it states that, in the event of default, the Partnership may declare all installments of rent immediately due and payable. Soon after the sublease had been signed, the Partnership reacted strongly to several minor infractions of the lease. According to the Partnership, this reaction warned the FDIC that the Partnership intended to enforce the sublease strictly. The sublease itself evinces a strong interest in promptness; section 15.15 states that "[a]ll time limits stated in this Sublease are of the essence."
 
 
 4
 On March 3, 1989, Project Development Corporation resigned as the general partner of the Partnership. The FDIC contends that this resignation capped a series of attempts by the limited partners to have it removed. Apparently, the limited partners were concerned that the Project Development Corporation was agreeing to numerous subleases for below-market rates. There were several unsuccessful legal attempts by the limited partners and the beneficiaries to remove the general partner, terminate the Master Lease, or dissolve the Partnership. With the removal of Project Development Corporation, "General Partner of Cain, Inc." became the general partner of the Partnership and the Trust became a limited partner with a 48% interest in the Partnership. Larry Parrish, an attorney hired by the original limited partners during their litigation with Project Development Corporation, was the president and sole shareholder of "General Partner of Cain, Inc."
 
 
 5
 On March 29, 1989, the Partnership sent a letter to Mike Powell, an FDIC in-house attorney. The letter informed the FDIC of the change in general partners, and also stated that
 
 
 6
 all rent payments will [henceforth] be received by The Cain Partnership, Ltd. at Post Office Box 1275, Knoxville, Tennessee 37901. Payments will be collected from this Post Office Box each business day, and your rent will be considered to have been paid on the date it is received in the above Post Office Box.
 
 
 7
 (emphasis added). Although § 3.03 of the sublease provides that each rent payment was due at the beginning of the month, the Partnership contends that the April check was received no earlier than April 25, 1989; this check was dated April 4, 1989. The rent due on December 1, 1989 was received on December 18, 1989; this check was dated December 12, 1989. Under § 3.03 of the sublease, the FDIC must pay interest and collection charges if rent installments are received late. On January 2, 1990, the Partnership sent a letter to the FDIC demanding late fees and interest for the April and December rents. According to the FDIC, this was the first time the Partnership had complained about the April payment. Between January 2 and March 28, 1990, the Partnership and the FDIC did not communicate, and the Partnership made no further attempts to collect the late fees and interest.
 
 
 8
 Section 3.02 of the sublease provides for annual price indexing of the rent, and requires the lessor to give notice to the FDIC of any adjustment within ninety days of the "Anniversary Month," which is defined as "September of 1986 and each successive September thereafter during the Term." On December 28, 1989, the Partnership sent a notice to the FDIC that it had raised the rent by $281.81 per month. The letter also asked for an immediate payment of the difference in the old and new rents from September to December. However, the FDIC continued to make its monthly payments without the escalated rent, and these payments were accepted without objection. The FDIC also failed to pay the money owing from September through December.
 
 
 9
 On March 29, 1990, Geoffrey Kranz, an FDIC attorney, called Mr. Parrish to discuss the property. During this conversation Mr. Parrish alarmed Mr. Kranz by commenting that he was uncertain whether the FDIC had been performing under the sublease. Responding to Mr. Kranz's concern, Mr. Parrish stated that he knew that the Partnership had written some letters to the FDIC concerning some lack of performance but that he could not recall the matters addressed by the letters in sufficient detail to inform Mr. Kranz further about the subject. He told Mr. Kranz that he would refresh himself with respect to the details in order to further advise Mr. Kranz on the subject. Mr. Kranz responded that he would await further information on the matter.
 
 
 10
 The next day, March 30, Mr. Parrish sent a letter to the FDIC declaring it to be in default and demanding $4,583,870 in accelerated rent. The Partnership then filed this lawsuit on April 17, 1990. At some point--whether before or after the suit was filed is disputed--the FDIC attempted to pay the amount allegedly due for late fees and interest. Whenever this tender was made, the Partnership rejected it. Soon after filing suit, the Partnership agreed with the Trust, effective August 15, 1990, to terminate the Master Lease no later than April 26, 1993. On June 15, 1990, the Partnership filed a motion for summary judgment. The FDIC responded with its own motion for summary judgment on August 1, 1990. The district court denied the FDIC's motion on September 24, 1990. On December 12, 1990, Mr. Parrish was deposed and discussed the agreement mentioned above between the Partnership and the Trust. The FDIC then responded to the Partnership's motion for summary judgment by arguing that no court should grant a request to accelerate lease payments until the year 2045 when the sublessor intends to terminate the lease by 1993. On January 15, 1991, the Partnership entered into a new agreement with the Trust, which states, in part, that the Trust will assume all of the obligations of the Partnership to the FDIC. However, the January 15 agreement will go into effect only if the Partnership receives and holds the accelerated rent in trust for the Trust.
 
 
 11
 On March 12, 1991, the district court denied the Partnership's motion for summary judgment. It further stated that "the FDIC should be allowed to cure its default and parties should resume operation under the sublease for as long as possible." It then entered an order on his own motion dismissing the case in its entirety. The Partnership appeals both the denial of its motion for summary judgment and the district court's decision to dismiss the suit.
 
 II
 
 12
 Before turning to the merits of the Partnership's appeal, we must determine the proper standard of review. In Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196 (1988), we explained that "in reviewing a district court's ruling denying a summary judgment motion on grounds that a material issue of fact exists appellate review is governed by an 'abuse of discretion' standard." However, the district court's denial of Cain's motion for summary judgment does not rest on a holding that material issues of fact exist. Instead, it concluded that "[in] light of the fact that the FDIC might well have only two more years of secure possession of the premises, the Court cannot, in good conscience, allow acceleration of 55 years' [sic] of rent." Furthermore, the district court dismissed the case in full on its own motion. Apparently, the district court concluded that the Partnership had acted so inequitably by agreeing to terminate the Master Lease that its request for accelerated rent must be denied, no matter what the other facts of the case. Such a decision must have been based on the district court's application of the relevant law to certain facts. "This is thus a mixed question of fact and law, and the standard of review is de novo." Hardin v. Straub, 954 F.2d 1193, 1198 (6th Cir.1992); see also Whitney v. Brown, 882 F.2d 1068, 1071 (6th Cir.1989).
 
 III
 
 13
 This case turns on the enforceability of § 10.02(a) of the sublease, which provides that, if the FDIC defaults:
 
 
 14
 [the Partnership] may elect to continue this Sublease in effect and, at its option, declare all installments of Rent, as adjusted at the time of default for the remainder of the Term, and Additional Rent immediately due and payable.... [T]he adjusted Rent then in effect shall be deemed to be in effect for the remainder of the Term without regard to the escalation provisions of this Sublease, but the amount of accelerated Rent due hereunder shall not otherwise be reduced to present value.
 
 
 15
 We have not found any Tennessee cases that directly address the enforcement of a rent acceleration clause. However, as Tennessee courts have often relied upon the Restatement of Property, see, e.g., Knight v. Utz, 673 S.W.2d 161, 164 (Tenn.Ct.App.1984); Banovic v. Davis, 642 S.W.2d 153, 156 (Tenn.Ct.App.1982), we believe it appropriate to consult the Restatement.
 
 
 16
 The Restatement (Second) of Property treats a rent acceleration clause as a valid expansion of the landlord's remedies, but also states that such a clause may be unconscionable. If the clause does not provide for any discount as to rent for the remaining term, its enforcement effectively increases the total amount of rent that would otherwise be paid under the lease. Thus, it may be unconscionable to enforce the clause without a discount, particularly if the lease has a substantial number of years to run at the time the acceleration takes place. On the other hand, the clause could be enforced with an appropriate discount being allowed. In any event, an acceleration clause without a discount factor is not automatically unconscionable, because it is designed to discourage default. A rent acceleration clause may also be unconscionable if it provides for rent acceleration on a default by the tenant without first requiring the landlord to demand that the tenant eliminate the default, and giving the tenant a reasonable time to comply. Restatement (Second) of Property § 12.1 cmt. k (1977).
 
 
 17
 The Restatement also recognizes that rent acceleration clauses are more severe than acceleration clauses for debts. Enforcement of a rent acceleration clause requires the tenant to pay for something he has not yet received, while the debtor on an accelerated promissory note is simply returning something he has already gotten. The greater severity of a rent acceleration clause "justifies blunting its thrust where equitable considerations are present." A tenant's willingness to provide adequate security for the future payment of rent as it becomes due "should block the enforcement of the rent acceleration clause." Finally, if the landlord enforces the rent acceleration clause, he cannot terminate the lease for the default that triggered the acceleration. In fact, the landlord cannot terminate the lease for any default, unless he reimburses the tenant for the rent paid in advance, less any damages caused by the default. Ibid.
 
 
 18
 These rules comport with other aspects of Tennessee law. "[T]here is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law." TSC Indus., Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). Such equitable considerations can prevent the enforcement of mortgage acceleration clauses. In Gunther v. White, 489 S.W.2d 529, 531 (Tenn.1973), the Tennessee Supreme Court recognized that "a court of equity has the power to relieve a mortgagor from the effect of an operative acceleration clause in a mortgage where the condition making the option operative is the result of some unconscionable or inequitable conduct of the mortgagee." See also Overhold v. Merchants & Planters Bank, 637 S.W.2d 463, 466 (Tenn.Ct.App.1982) (where a tender is made after default, but before mortgagee has exercised his option to accelerate, the mortgagee must accept the money). However, the Gunther court recognized that such clauses were not automatically invalid. "[T]he exercise of an option to accelerate for breach of a condition does not amount to the enforcement of a forfeiture or a penalty which a court of equity will restrain." 489 S.W.2d at 531; see also Lee v. Security Bank & Trust Co., 124 Tenn. 582, 139 S.W. 690 (1911).
 
 
 19
 Tennessee law also allows courts to deny enforcement of unconscionable contracts. In a recent decision, the Tennessee Court of Appeals explained unconscionability as follows:
 
 
 20
 "A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable."
 
 
 21
 Haun v. King, 690 S.W.2d 869, 872 (Tenn.Ct.App.1984) (quoting Brenner v. Little Red Schoolhouse, Ltd., 302 N.C. 207, 210, 274 S.E.2d 206 (1981) (citations omitted)). Thus, we hold that under Tennessee law, rent acceleration clauses are generally valid, although courts may deny enforcement if a clause is unconscionable or blocked by equitable considerations, as described in the Restatement and case law.
 
 IV
 
 22
 We cannot apply this holding to this case however, as our review of the record reveals too many factual disputes to allow this court to determine whether this clause should be enforced. The Partnership makes a strong case for the fairness of its claim. It argues that the rights of the FDIC to continued possession of the subleased premises have always been wholly dependent on the continuation of the master lease between the Partnership and the Trust. Thus, it claims that the January 15 assignment actually improves the FDIC's position, because it serves as a fully enforceable contract to which FDIC is a third-party beneficiary. The Partnership also contends that it could always terminate the lease, evict the FDIC, and seek damages for breach of contract. It argues that in light of this choice, specific performance of the rent acceleration provisions seems much less onerous.
 
 
 23
 The Partnership also disputes the district court's statement that the amount of the default is "arguably trivial in comparison to the total obligation under the 60 year lease." The Partnership avers that a larger view of the situation includes other breaches. It alleges that the FDIC paid its rent late every month from and including April 1989 through April 1990, and notes that these months of late-paid rent came after its March 29, 1989 letter warning that rent would be considered paid on the day it was received. It claims that the FDIC's continuing refusal to pay the full amount of its rent after it was escalated by the Partnership also constitutes a serious breach, and contends that the FDIC began tendering payments for late fees and interest only after the Partnership had filed suit. Furthermore, the Partnership argues that it gave the FDIC several notices of default even though § 3.04 of the sublease provides that "[r]ent ... shall be paid without notice or demand." Section § 10.01(a) of the sublease states that default occurs when a breach persists for fifteen days beyond the date of the written notice. Yet according to the Partnership, the FDIC allowed two separate notices--those of January 2, 1990 and March 30, 1990--to go by for more than fifteen days without response.
 
 
 24
 In light of these contentions, as well as those listed in the earlier part of this opinion, we cannot say that, as a matter of law, the rent acceleration clause should not be enforced. The Partnership has described a situation in which the FDIC willingly entered into a contract, knowingly persisted in a number of serious breaches for some time, and now asks this court to protect it from the results of its actions. Furthermore, according to the Partnership, its January 15 agreement with the Trust secures the FDIC's tenancy, rather than endangering it. Even the district court acknowledged that the agreement between the Partnership and the Trust "appears to guarantee the FDIC's right to continued possession of the premises subject to the conditions of the sublease and in the event that the FDIC pays the full accelerated rent pursuant to this lawsuit." Thus, we cannot affirm the district court's sua sponte dismissal of the Partnership's claim; there do seem to be possible fact patterns in which the rent acceleration clause should be enforced.
 
 V
 
 25
 The FDIC also contends that the acceleration clause is unenforceable because it is a penalty. Although the district court rejected this claim in denying the FDIC's motion for summary judgment, and although the FDIC did not appeal from that denial, it may still make this argument to this court. "The prevailing party may ... assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court." Dandridge v. Williams, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6 (1970).
 
 
 26
 The FDIC contends that the possible loss of possession, coupled with fifty-five years of accelerated rental payments, amply demonstrates the punitive nature of the Partnership's claim. The sublease contains several remedies, which are cumulative, and the Partnership may seek any or all of them. Furthermore, the FDIC argues, the sublease does not distinguish between material and trivial defaults. Thus, even the most trivial technical default can result in a full acceleration of millions of dollars of unaccrued rental payments and immediate repossession of the premises long before the end of the sublease term. Even though the FDIC agreed to these terms in the sublease, it claims that they cannot be enforced. "[T]he parties to a contract are not free to provide a penalty for its breach." Restatement (Second) of Contracts § 356 cmt. a (1979).
 
 
 27
 The FDIC also claims that the rent acceleration clause should be considered a liquidated damages provision that is unenforceable because the clause does not represent a reasonable estimate of damages. "Even if the parties intended to fix an amount as liquidated damages, recovery will be limited to actual damages if the amount stipulated for is so greatly in excess of the actual damages that it is, in effect, a penalty." Eller Bros., Inc. v. Home Fed. Sav. & Loan Ass'n, 623 S.W.2d 624, 628 (Tenn.Ct.App.1981). In this case, the FDIC reasons, awarding $4.5 million for a breach worth $4,500 would constitute a penalty. Furthermore, it argues, under the literal terms of the sublease, the Partnership could claim the right to reenter the property as an additional remedy for the defaults alleged in this action or for some future default.
 
 
 28
 We need not address whether Tennessee law would treat the rent acceleration clause as a measure of liquidated damages, because if the Partnership's description of the facts is accurate, this clause would survive such an analysis. We also reject the argument that the clause constitutes a penalty even if not considered a measure of liquidated damages. As the district court noted when it denied the FDIC's motion for summary judgment, "the FDIC is not being asked to pay more than it contracted for--the damages are the actual value of the lease not some additional punitive amount." Furthermore, under the facts as described by the Partnership, we cannot say that the breaches involved are trivial or insignificant. The total debt involved amounts to almost a month's rent, and the Partnership has also alleged a pattern in which the FDIC has repeatedly made late payments, ignored notices, and refused to pay late fees and interest. The sublease was the result of lengthy negotiation between the parties; the FDIC was thoroughly familiar with this sublease and its rent acceleration clause.
 
 
 29
 Finally, we note that the sublease allows the Partnership to adjust the rent for increases in the cost of living. Because of this provision, enforcement of the acceleration clause would not necessarily have the effect of increasing the real value of the rent that the FDIC must pay. Presumably, the Partnership will continue to raise the rent to compensate for inflation, thus keeping the rent at the same price in real dollars. Thus, by paying its rent all at once, the FDIC might not be paying significantly more, in net present value, than it would eventually pay over many years.
 
 
 30
 Thus, we conclude that if the Partnership's description of the facts is accurate, the clause should not be struck down as punitive. In reaching this conclusion, we agree with the following analysis from the New York Court of Appeals:
 
 
 31
 There can be no claim that the sum reserved under the acceleration clause here bears no relationship to the damages sustained by landlord as a result of the breach. The clause is nothing more than a bargained-for device which seeks to insure the performance of a material element of the obligation of the tenant and fixes the damages for its breach. Upon failure to tender a rental payment, the landlord was merely afforded its contractual option to receive the rental payments reserved for the remainder of the lease term as a condition of defendant's continued occupancy.
 
 
 32
 Fifty States Mgt. Corp. v. Pioneer Auto Parks, Inc., 46 N.Y.2d 573, 579, 415 N.Y.S.2d 800, 803, 389 N.E.2d 113, 116-17 (1979).
 
 VI
 
 33
 Thus, we cannot affirm the district court's decision to dismiss this case. On the other hand, we cannot enter summary judgment on behalf of the Partnership, for the FDIC has raised several disputed issues of material fact. Summary judgment can be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 
 34
 First, the FDIC denies having breached the contract. It argues that while the Partnership had the power to establish the "manner" in which monthly payments are made, it could not unilaterally declare that rent would be considered paid on the day it was received. Under Tennessee law, the usual rule is that payment is made once the check is in the mail, if "such mode of payment is according to the usual course of dealings between the parties, from which the creditor's assent can be inferred." Brandtjen & Kluge, Inc. v. Pope, 28 Tenn.App. 679, 693, 192 S.W.2d 496, 501 (1945). The FDIC maintains that the cost-of-living increases claimed by the Partnership were not due because it did not receive notice of the increases within ninety days of September 1, the beginning of the Anniversary Month. The Partnership, of course, holds that the notice need be sent within ninety days of the end of September. The sublease is silent on this issue. Finally, the FDIC maintains that § 3.03 of the sublease provides for a ten-day grace period beyond the first of the month, meaning that late payments are not necessarily breaches of the sublease.
 
 
 35
 Next, the FDIC insists that it was not given adequate notice of alleged breaches. Under § 10.01 of the sublease, the Partnership cannot declare the FDIC in default unless the FDIC receives written notice of the default and is afforded a fifteen or twenty-day opportunity to cure. Prior to March 3, 1989, according to the FDIC, warning letters from the Partnership indicated the nature of the breach, expressly stated the effect of a failure to cure, and revealed the period of time in which to cure. The notices sent by the Partnership after this date were not so thorough, and thus the FDIC reasons that they were not valid notices within the parties' conduct, and did not warn the FDIC that it faced the heavy burden of rent acceleration. "Notice which is a mere gesture is not notice. The means employed must be such as one desirous of actually informing the absent party might reasonably employ." Burden v. Burden, 44 Tenn.App. 312, 319, 313 S.W.2d 566, 570 (1957).
 
 
 36
 We hold that both of these arguments demonstrate the existence of material issues of fact. Obviously, if the FDIC's claims regarding notice and breach of contract are true, the rent acceleration clause should not be enforced. Under such circumstances, summary judgment is inappropriate.
 
 VII
 
 37
 Both the FDIC and the Partnership present many other arguments, but we need not discuss them at this time. The disputes already mentioned are sufficient to convince us that this case cannot be decided without extensive factual findings. We wish to emphasize that in discussing these disputes, we have been quite careful to avoid ruling on them; this responsibility must rest initially with the district court. The March 12, 1991 opinion of the district court is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.